**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

KEENAN MCINTOSH, )
)
       Plaintiff, )
)
  vs. )
)   Civ. A. No. 20-1957
)
JOHN E. WETZEL, et al, )
)
       Defendants. )
)
)

**<u>MEMORANDUM OPINION</u>**[1]

    Plaintiff Keenan McIntosh ("McIntosh"), who is proceeding *pro se*, is a state prisoner who at all relevant times was housed either at State Correctional Institution ("SCI") at Houtzdale or SCI-Pine Grove.[2]  McIntosh brings claims under the First, Eighth, and Fourteenth Amendments and Pennsylvania state law against former Secretary of Corrections John E. Wetzel, Superintendent Barry Smith, Deputy Superintendent Close, Deputy Superintendent B.J. Salamon, unidentified Certified Emergency Response Team ("CERT") members, "Nurse," Captain Lewis, Captain Acey, Lt. Detwiler, Lt. H. Veihdoffer, Sgt. Rieg, Correctional Officer ("C.O.") Miller, C.O. Stivison, C.O. Hershberger, Superintendent Lee J. Estock, C.O. Rietscha, Librarian B. Weaver, and Security Captain B. Sheeder (collectively, the "Corrections Defendants") in their official and individual capacities.

    Pending before the Court is a partial motion to dismiss filed by the Corrections Defendants. (ECF No. 42.)  For the reasons below, the motion will be granted in part and denied in part.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. Thus, the undersigned has the authority to decide dispositive motions and enter final judgment.
[2] McIntosh is currently confined at SCI-Phoenix.

## I.   **Relevant Procedural History**

After his motion to proceed in forma pauperis was granted, McIntosh's initial complaint was docketed on January 8, 2021.  (ECF No. 7.)  The Corrections Defendants moved to dismiss, and McIntosh responded by filing an Amended Complaint.  (ECF Nos. 19; 27.)  The Corrections Defendants then filed a motion for a more definite statement, which this Court granted and ordered McIntosh to file a second amended complaint.  (ECF Nos. 29; 34.)  McIntosh did so on August 19, 2021.  (ECF No. 34.)

The Corrections Defendants again moved to dismiss.  (ECF No. 35.)  McIntosh filed a response in opposition, which included substantial additional facts.  (ECF No. 41.)  Consequently, the Court denied the motion to dismiss without prejudice.  (*Id.*)  It also notified the parties that it would "construe Plaintiff's response as a supplement to his Second Amended Complaint," and ordered the Corrections Defendants to plead or otherwise respond by January 22, 2022.  (*Id.*)  The Corrections Defendants subsequently filed a motion for partial dismissal pursuant to Fed. R. Civ. P. 12(b)(6).  (ECF No. 42.)  McIntosh having filed a response in opposition (ECF No. 45), the motion is ripe for disposition.

McIntosh has expressly asserted the following claims: (1) First Amendment retaliation; (2) excessive force, failure to protect, and conditions of confinement under the Eighth and Fourteenth Amendments; (3) negligence; (4) intentional infliction of emotional distress ("IIED"); and (5) breach of contract.

## II.   **Relevant Factual Background**

### A.  Events at SCI-Houtzdale

On January 8, 2019, Lt. Veihdoffer, Nurse, and unidentified  members of the CERT team informed McIntosh that he was being transferred from the mental health unit to the restricted

housing unit ("RHU") at SCI-Houtzdale.  (ECF No. 34, *Negligence* ¶ 1.)  When McIntosh refused to go, Lt. Veihdoffer and one of the CERT team members sprayed McIntosh with mace as the remaining CERT team members and Nurse stood by and watched.  (*Id.*)  Despite not being able to breathe or see and the fact that these parties knew that he had asthma, McIntosh was then handcuffed and escorted to the RHU on the C block.  (*Id.*)

Upon arrival at his new cell, someone shouted, "Put him in that fucked up cell" and "Get that mattress out of there" before he was ordered to lie down on the bed's metal frame.  (*Id.*)  He was then ordered to open his eyes so that Nurse could rinse them.  (*Id.*)  Instead, someone sprayed him with mace a second time.  (*Id.*)  Everyone then left.  (*Id.*)  The cell in which McIntosh was placed was an observation cell with a camera both inside the cell and outside the door.  (*Id.*)

McIntosh was housed in this cell for the next seventy-two days (until March 19, 2019).  (*Id.* ¶ 2.)  During this period, because his eyes were never rinsed, he endured reoccurring asthma attacks and sustained permanent eye damage.  (ECF No. 34, *Failure to Protect* ¶¶ 1, 2.)  The cell in which McIntosh was placed had a window with a "ten[-]inch spiderweb shape[d] crack."  (ECF No. 34, *Negligence* ¶ 1.)  Because the window's crack was so large and much of the time he was housed there was in the middle of winter, ice accumulated in his cell.  (*Id.* ¶ 2.)  Although he complained to C.O. Hershberger and C.O. Miller during routine searches of his cell, they joked that his cell looked like "Siberia" instead of helping him. (*Id.*)

During the first two weeks of his stay, a light was left on outside of his cell and he was denied a mattress, bedding, clothing, footwear, toilet paper, showers, a functioning toilet, cleaning supplies, and trips to the yard.  (ECF No. 34, *Negligence* ¶ 2, *IIED* ¶ 2.)  As a result, he was forced to sleep on a freezing metal bedframe, the concrete floor, or on the metal toilet that was overflowing with urine and feces due to the water being cut off in his cell.  (*Id.*)  Throughout this

seventy-two-day period, he sought help from Deputy Superintendent Salamon, Captain Lewis, Sgt. Rieg, Lt. Detwiler, C.O. Stivison, and Superintendent Barry Smith.  (*Id.*; ECF No. 38(6).) Although he was told he would be moved to another cell once he was no longer on mattress and toilet paper restriction, it took seventy-two days for that occur.  (*Id.*)

Because no action was being taken, McIntosh availed himself of the grievance system.  He filed Grievance No. 792494 on March 19, 2019, in which he requested relief in the form of pictures of the damaged window, any documents related to the damages in his cell, and all camera footage while he was a resident there, i.e., from January 8, 2019 until March 19, 2019.  (ECF No. 34, *Negligence* ¶ 2.)  The grievance coordinator denied the grievance, and Superintendent Barry Smith, who was named in the grievance, upheld the decision.  (*Id.*)

McIntosh then filed a second grievance, Grievance No. 795404, on April 21, 2019, asking for video footage and documents recording the damage to his cell.  (*Id.* ¶ 3.)  Captain Acey performed the Initial Review, and Superintendent Barry Smith upheld the response at the Facility Manager level.  (*Id.*)  McIntosh believes that Captain Acey deliberately failed to preserve video footage McIntosh needs to prove his case and Superintendent Barry Smith ratified his actions. (*Id.*)  Because he was never provided with the video footage, McIntosh believes Superintendent Barry Smith engaged in a cover-up scheme with respect to both of his grievances at SCI-Houtzdale. (ECF No. 38 ¶ (b)(3).)

### B.   Events at SCI-Pine Grove

McIntosh was then transferred from SCI-Houtzdale to SCI-Pine Grove.  (ECF No. 34, *Negligence* ¶ 4.)  C.O. Stivison was transferred to SCI-Pine Grove around the same time.  (*Id.*)  On October 27, 2020, while McIntosh was housed in the RHU, C.O. Stivison informed him that there was a "target on his back," that C.O. Stivison "knew who he was [be]cause of what he [had done]

4

to his brother[,] and that he was going to continue to make [McIntosh's] life a living hell."  (*Id.*)
McIntosh has never met C.O. Stivison's brother and suspects C.O. Stivison may have been
referring to himself.  (*Id.*)

Following this event, McIntosh filed Grievance No. 898642 on November 10, 2020,
relating to C.O. Stivison's threat of retaliation.  (ECF No. 34, *Negligence* ¶ 5.)  Security Captain
Sheeder and Superintendent Estock responded.  (*Id.*)  McIntosh alleges that they improperly denied
him video footage from the dates of October 27, 2020 through November 9, 2020, as part of a
cover-up scheme.  (*Id.*)  Specifically, Security Captain Sheeder denied the request on the ground
that C.O. Stivison never worked in the RHU and Superintendent Estock responded similarly to
cover-up the retaliation.  (*Id.*).

On October 22, 2020, McIntosh sent "transcripts" to the library to be copied so he could
prepare an appeal in his criminal case.  (*Id.* ¶ 6.)  Five days later, Librarian Weaver and
C.O. Rietscha delivered his legal documents to another cell.  (*Id.*)  This occurred despite every
prisoner's name being listed outside each cell and McIntosh's actions of repeatedly calling out to
Librarian Weaver and C.O. Rietscha from his cell, inquiring about the whereabouts of his copies,
and specifically requesting that they "make sure" they were delivering the copies to the right cell.
(*Id.*)  The prisoner who erroneously received McIntosh's documents notified a corrections officer,
and McIntosh received his documents one hour later.  (*Id.*)  When McIntosh received them, none
of the pages had been copied and some of the pages of the originals were missing.  (*Id.*)  Because
his transcripts were not copied, McIntosh contends his motion for leave to file an amended appeal
to the Supreme Court of Pennsylvania was denied.  (*Id.*)  Thereafter, McIntosh filed Grievance
No. 896471.  (*Id.*)

McIntosh contends he now suffers from reoccurring asthma attacks, permanent damage to his left eye and feet, back pain, arthritis, inflammatory damage to his feet, difficulty sleeping, and psychological distress in the form of panic attacks, anxiety, depression, trouble sleeping, and an intense fear of seeking psychological treatment.  (ECF No. 34, *Injury* ¶ 1.)  He further suggests that the loss of his legal documents was an invasion of privacy, caused him to lose his criminal appeal which in turn resulted in a loss of liberty, and created further psychological distress.  (*Id.* ¶ 7.)  He seeks only monetary relief for these alleged damages.  (ECF No. 34, *Prayer for Relief.*)

### III.   <u>Legal Standard</u>

A complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed, in whole or in part, for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a Rule 12(b)(6) motion, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2009)).  However, conclusory allegations "are not entitled to the assumption of truth."  *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  "In other words," the Third Circuit Court of Appeals has explained, the court "'must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.'"  *Id.* at 131 (quoting *Fowler*, 578 F.3d at 210-11).  The court must "also disregard 'naked assertions devoid of further factual enhancement' and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 678).

To survive a motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). In sum, the plaintiff "must plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014).

To assess the sufficiency of a complaint under *Twombly* and *Iqbal*, a court must take three steps: (1) outline the elements the plaintiff must plead to state a claim for relief; (2) peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth; (3) look for well-pled factual allegations, assume their veracity, and then determine whether they plausibly give rise to an entitlement to relief. *See, e.g., Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). The court's plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

"A document filed *pro se* is to be liberally construed . . . and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citation and quotation marks omitted); *see also Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011) ("The obligation to liberally construe a pro se litigant's pleadings is well-established"). Additionally, the court must "apply the relevant legal principle even when the complaint has failed to name it." *Mala v. Crown*

*Bay Marina, Inc.*, 704 F.3d 239, 244 (3d Cir. 2013).  Nevertheless, "pro se litigants still must allege sufficient facts in their complaints to support a claim[,]" and "they cannot flout procedural rules— they must abide by the same rules that apply to all other litigants."  *Id.* at 245.

## IV.  <u>Discussion</u>

### A.  <u>Claims against the Corrections Defendants in their Official Capacities</u>

The Corrections Defendants argue that the Eleventh Amendment bars all claims against the Corrections Defendants in their official capacities.  (ECF No. 43 at 16.)  McIntosh responds that even if this is the case, he nonetheless has stated viable claims against them in their individual capacities.  (ECF No. 45 ¶ 2.)

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted). In this case, the Corrections Defendants were employees of the DOC.  Therefore, a suit against them in their official capacities is, in reality, a suit against the DOC, and it is no different from a suit against the Commonwealth of Pennsylvania.

The Eleventh Amendment provides states with immunity not only from suits brought by citizens of other states, but also from suits brought by their own citizens.  *Hans v. La.*, 134 U.S. 1, 12-14 (1890).  However, a state's Eleventh Amendment protection from federal suits is not absolute.  Congress may authorize such a suit under its power to enforce the Fourteenth Amendment, *College Savings Bank v. Fl. Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 670 (1999), thereby abrogating a state's sovereign immunity, but only "when it both unequivocally intends to do so and 'acts pursuant to a valid grant of constitutional authority,'" *Board of Trustees of the University of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) (quoting *Kimel v.*

8

*Bd. of Regents*, 528 U.S. 62, 73 (2000)).  A state may also waive its sovereign immunity by consenting to suit.  *Coll. Sav. Bank*, 527 U.S. at 670 (citing *Clark v. Barnard*, 108 U.S. 436, 447-48 (1883)).  Additionally, a person seeking purely prospective relief against state officials for ongoing violations of federal law may sue under the "legal fiction" of *Ex parte Young*, 209 U.S. 123, 159-60 (1908), despite the text of the Eleventh Amendment.  *Alden v. Maine*, 527 U.S. 706, 757 (1999).

By statute, the Commonwealth of Pennsylvania has specifically withheld its consent to be sued.  42 Pa. Stat. and Con. Stat. Ann. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States"); *see also Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir. 1981).  Additionally, Congress has not expressly abrogated Pennsylvania's Eleventh Amendment immunity from civil rights suits for damages.  *See, e.g., Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989) ("Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties"); *Quern v. Jordan*, 440 U.S. 332, 341 (1979); *Boykin v. Bloomsburg Univ. of Pa.*, 893 F. Supp. 378, 394 (M.D. Pa. 1995) (holding that States' immunity has not been abrogated for actions brought under §§ 1981, 1983, 1985, and 1986), *aff'd,* 91 F.3d 122 (3d Cir. 1996).

For these reasons, McIntosh is barred from seeking money damages against the Corrections Defendants in their official capacities.  Because he does not plead any claim for prospective relief arising out of any ongoing violation of federal law (ECF No. 34, *Jurisdiction & Venue* ¶ 1), he also has not asserted a viable claim for prospective relief against the Corrections Defendants in

their official capacities.  As such, the Court will grant the motion to dismiss relative to McIntosh's claims against the Corrections Defendants in their official capacities.

B.  <u>Claims against the CERT Team Members</u>

The Corrections Defendants argue that the CERT team is not a proper defendant and should be dismissed because it is an agent of the state and as such, enjoys Eleventh Amendment immunity. (ECF No. 43 at 7-8.)  McIntosh responds that he "listed CERT Team Members as a defendant in order to act as a placeholder until these individuals are exposed during the discovery phase."  (ECF No. 45 ¶ (f)(1).)

In his Second Amended Complaint and Supplement, McIntosh names "Certified Emergency Response Team members" as a party.  (ECF No. 34, *Parties* ¶ 15.)  While it is true "the CERT team, sued in its official capacity, is entitled to the same Eleventh Amendment immunity that the Commonwealth enjoys," *Gonzalez v. Harlow*, No. CA 12-309, 2014 WL 688765, at *3 (W.D. Pa. Feb. 21, 2014), McIntosh has made it clear that he intended to use this name as a placeholder until he learns the names of the bad actors in discovery.  Given this, the Court will construe the claims against the "Certified Emergency Response Team Members" in the Second Amended Complaint and Supplement to be claims against "John and Jane Doe members of the CERT Team" and deny the Corrections Defendants' motion to dismiss as to them.

C.  <u>First Amendment Retaliation Claims against Librarian Weaver, C.O. Rietscha, and C.O. Stivison</u>

The Corrections Defendants also move to dismiss McIntosh's First Amendment retaliation claims against Librarian Weaver, C.O. Rietscha, and C.O. Stivison.  (ECF No. 43 at 9-10.)  Specifically, they argue that McIntosh has alleged nothing more than bald, unsupported accusations that it was Librarian Weaver and C.O. Rietscha's conscious objective to sabotage McIntosh's criminal case and retaliate against him for seeking legal redress against a coworker.

(*Id.*)  Additionally, with respect to C.O. Stivison, they assert McIntosh failed to allege an adverse action sufficient to deter him from exercising his constitutional rights because verbal harassment, without more, does not rise to the level of an adverse action.  (*Id.*)

McIntosh responds that Librarian Weaver and C.O. Rietscha were aware that he had filed a grievance against C.O. Stivison and purposefully gave his legal documents to another prisoner, which ultimately resulted in him losing his appeal.  (ECF No. 45(3)(h).)  Concerning his claims against C.O. Stivison, McIntosh responds that his claims stem from C.O. Stivison's threat related to filing a grievance.  (ECF No. 45 ¶ (3)(g)(2).)

To state a claim for retaliation, a prisoner must allege that: (1) he was engaged in constitutionally protected conduct; (2) the defendant at issue took an adverse action against him; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take that adverse action.  *See, e.g., Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).  An "adverse action" is one that would "deter a person of ordinary firmness from exercising his First Amendment rights."  *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)).

Verbal threats alone do not constitute an adverse action for purposes of establishing a prima facie retaliation claim.  *See, e.g., Chruby v. Kowaleski*, 534 F. App'x 156, 161 (3d Cir. 2013).  *See also Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012) (finding no adverse action based on allegations that defendants called plaintiff a "marked man" and threatened his "days were numbered"); *Mack v. Clark*, Civ. A. No. 1:21-CV-0004, 2022 WL 2669510, at *11 (W.D. Pa. July 11, 2022) ("An unexecuted threat to file a misconduct report is not an 'adverse action' because it is not sufficiently severe to deter a reasonable person from pursuing his rights").

11

Accordingly, in the absence of any other allegations, C.O. Stivison's threat simply does not rise to the level of an adverse action and McIntosh's First Amendment retaliation claim against him must be dismissed.

McIntosh has plausibly pleaded a First Amendment retaliation claim against Librarian Weaver and C.O. Rietscha, however.[3]   He has alleged adverse action because having one's property discarded would discourage a person of ordinary firmness from engaging in further constitutionally protected activity.  *See Jackson v. Carter*, 813 F. App'x 820, 825 (3d Cir. 2020). He further pleaded that this was done in order to stop him from pursuing legal action against C.O. Stivison.  Therefore, the motion with respect to Librarian Weaver and C.O. Rietscha will be denied.

D.  <u>IIED Claims</u>

The Corrections Defendants argue that McIntosh's allegations are too vague to support a claim for IIED because he has not alleged a physical harm that resulted from extreme and outrageous conduct.  (ECF No. 43 at 12-13.)  McIntosh summarily responds that the Corrections Defendants' motion with respect to these claims is "frivolous."  (ECF No. 45 ¶ 5.)

To state a claim for IIED, a plaintiff must allege: "(1) extreme and outrageous conduct; (2) intentional or reckless conduct; (3) conduct caused the emotional distress; and (4) severe emotional distress."  *See, e.g., Smith v. Wa. Area Humane Soc'y*, No. 2:19-cv-1672, 2020 WL 6364762, *8 (W.D. Pa. Oct. 29, 2020) (citation omitted).  Importantly, the "[p]laintiff must allege physical manifestations of the emotional distress."  *Id.* (emphasis added) (citing *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1122 (Pa. Super. Ct. 2004)).  Thus, "a plaintiff 'must

---

[3] To the extent McIntosh may be raising an access to courts claim, this claim would also be without merit because there are no facts suggesting that he "lost a chance to pursue a 'nonfrivolous' or 'arguable'" legal claim or lost a remedy.  *See Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008).

suffer some type of resulting physical harm due to the defendant's outrageous conduct.'" *Richardson v. Barbour*, No. 2:18-cv-1758, 2020 WL 4815829, at *14 (E.D. Pa. Aug. 19, 2020) (quoting *Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir. 2010)). *See Dobson v. Milton Hershey Sch.*, 356 F. Supp.3d 428, 439-40 (M.D. Pa. 2018) (holding plaintiff's bald allegations of "physical harm," "physical manifestations of emotional distress," and "conscious pain and suffering" were not enough, without more, to set forth a plausible IIED claim). *See also Hoy v. Angelone*, 720 A.2d 745, 755 (Pa. 1998) (describes IIED as a "most limited" tort); *Gomez v. Markley*, No. 2:07-cv-868, 2011 WL 112886, at *1 (W.D. Pa. Jan. 13, 2011) ("in order to state a claim for [IIED] under Pennsylvania Law, a plaintiff must establish physical injury or harm . . . at the very least, existence of the alleged emotional distress must be supported by competent medical evidence") (internal citations and quotation omitted).

The Corrections Defendants correctly contend that McIntosh has not made any allegations that he sustained a physical manifestation *as a result* of his emotional distress.  Instead, he merely suggests that he may need future psychological and psychiatric treatment.  This is not sufficient. Consequently, this Court will grant the Corrections Defendants' motion to dismiss McIntosh's IIED claims with prejudice.

E. <u>Breach of Contract Claims</u>

The Corrections Defendants also move to dismiss McIntosh's claims for breach of contract. They assert that McIntosh has pointed to no legal authority under which former Secretary Wetzel, Superintendent Barry Smith, Deputy Superintendent Close, Deputy Superintendent Salamon, and Superintendent Estock can be held liable for breaching a contractual agreement with McIntosh based on violating various prison policies and placing him in a cell with impermissible conditions.

(ECF No. 43 at 13.)  McIntosh responds by asserting that the Corrections Defendants' motion with respect to his breach of contract claim is "frivolous."  (ECF No. 45 ¶ 6.)

To plausibly plead a breach of contract claim under Pennsylvania law, a plaintiff must allege "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages."  *Marcus v. Truist Fin. Corp.*, No. CV 21-1037, 2022 WL 1524113, at *3 (E.D. Pa. May 13, 2022) (quoting *Udodi v. Stern*, 438 F. Supp. 3d 292, 299 (E.D. Pa. 2020)).  "Pennsylvania courts generally do not recognize handbooks as contracts without a clear intent of the parties to give a handbook contractual force."  *Talbert v. Corr. Dental Assocs.*, No. CV 18-5112, 2020 WL 890212, at *5 (E.D. Pa. Feb. 21, 2020).  "This is particularly true in the prison context where an inmate cannot accept an offer from the SCI or reach a meeting of the minds upon the terms of the handbook."  *Id.* (internal citation and quotation omitted).

In his Second Amended Complaint, McIntosh asserts that the Inmate Handbook constitutes a binding contract between Corrections Defendants and McIntosh. Based on this contention, McIntosh claims that the Corrections Defendants breached the terms of the handbook by failing to accommodate people with respiratory disabilities in use of force training.  However, as discussed, the Inmate Handbook is not a binding contract between a prison and an inmate.  Consequently, McIntosh's breach of contract claims will be dismissed with prejudice.

F.  Negligence Claims

The Corrections Defendants also move to dismiss McIntosh's negligence claims based on their contention that they are entitled to sovereign immunity as to these claims.  They assert that this is true even as to McIntosh's claims for lost legal documents against Librarian Weaver and C.O. Rietscha because they claim that McIntosh is not seeking monetary damages, does not identify what documents were missing, and merely asserts that the loss of these documents

negatively influenced his criminal appeal.  (ECF No. 43 at 14-15.)  McIntosh again summarily counters that the Corrections Defendants' motion with respect to his negligence claims is "frivolous" and should be denied.  (ECF No. 45 ¶ 7.)

In general, employees of the Commonwealth of Pennsylvania acting within the scope of their duties are immune from liability.  1 Pa. Stat. and Con. Stat. Ann. § 2310; *see, e.g., Moss v. Pa.*, 838 F. App'x 702, 707 (3d Cir. Dec. 9, 2020).  To this end, Pennsylvania's sovereign immunity statute affords broad immunity to state officials from state-law tort claims.  With respect to claims of negligence, there are certain specifically delineated exceptions to this general rule of sovereign immunity, including, in relevant part, when the claim pertains to the "care, custody or control of personal property in the possession or control of Commonwealth parties[.]"[4]  42 Pa. Stat. and Con. Stat. Ann. § 8522(b)(3).  *See Williams v. Stickman*, 917 A.2d 915, 918 (Pa. Commw. Ct. 2007), *appeal denied*, 917 A.2d 915 (Pa. 2007).  This exception may apply here with respect to certain allegations made in the Second Amended Complaint and Supplement.

Contrary to the Corrections Defendants' assertion, McIntosh is seeking monetary damages. Moreover, McIntosh also alleges that Librarian Weaver and C.O. Rietscha failed to return some of his legal papers, causing him to lose his appeal and sustain harm.  At this stage of the litigation, the Court cannot conclude that these two defendants are immune from suit with respect to any negligence claim McIntosh is asserting against them relative to his property.  For these reasons, the motion to dismiss the negligence claim is denied as to Librarian Weaver and C.O. Rietscha.

---

[4] The General Assembly has waived its sovereign immunity in cases of (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways, and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines.  42 Pa. Stat. and Con. Stat. Ann. § 8522(b).

Conversely, the negligence claims against the other Corrections Defendants will be dismissed with prejudice.  This is because McIntosh's allegations with respect to the remaining Corrections Defendants do not fall within any of the nine statutory exceptions.  Consequently, they are immune from suit and the negligence claims against them must be dismissed with prejudice.

G.  <u>Failure to Protect/ Intervene Claims</u>

The Corrections Defendants argue that McIntosh has not alleged facts to support his claim that one or more of them had a reasonable opportunity to intervene while he was being physically assaulted but chose not to do so.  (ECF No. 43 at 15-16.)  Once again, McIntosh responds that the Corrections Defendants' motion with respect to this claim is "frivolous."  (ECF No. 45 ¶ 8.)

It is well-established that any duty to intervene is limited to situations involving excessive force.  *Armstrong v. Furman*, No. 3:19-CV-141, 2020 WL 5545270, at *7 (W.D. Pa. Sept. 16, 2020).  "To be directly liable under a failure to intervene theory, (1) the plaintiff must have demonstrated that her underlying constitutional rights were violated; . . . (2) the officer had a duty to intervene; and (3) the officer must have had a realistic and reasonable opportunity to intervene."  *Klein v. Madison*, 374 F. Supp. 3d 389, 419 (E.D. Pa. 2019).  Here, the Corrections Defendants contend that they did not have a meaningful opportunity to intervene.

In the applicable complaint, McIntosh alleges that after he was sprayed with mace in front of Lt. Veihdeffer, Nurse, and members of the CERT team, he was then placed in handcuffs and forced to walk to his new cell despite him being unable to see or breathe.  Once he was placed in the cell, he was ordered to open his eyes so that Nurse could flush them out.  Instead of this occurring, however, he was sprayed with more mace before they left his cell.

Based on these allegations, the Court concludes that at this stage, McIntosh has pleaded a plausible failure to intervene claim against Lt. Veihdeffer, Nurse, and the Jane and John Doe

members of the CERT Team.  *See Martin v. Sec'y of Corr.*, Civ. A. No. 21-1522, 2022 WL 1576758, at *3 (3d Cir. May 19, 2022).  *Contra Miller v. Machuga*, Civ. A. No. 3:17-0771, 2022 WL 852855, at *6 (M.D. Pa. Mar. 22, 2022) ("as the video tape evidence points out, the physical force used lasted only minutes, and thus, even if the force were excessive, [the d]efendants lacked a 'realistic and reasonable' opportunity to intervene").  Therefore, the motion will be denied as to them.

At the same time, the motion to dismiss will be granted with prejudice as to the remaining Corrections Defendants.  None of these defendants are alleged to have been present during the above-described events and there are no plausible allegations to support their personal involvement.

H.  Eighth Amendment Claims against Captain Lewis, Deputy Superintendent Salamon, Lt. Detwiler, and Sgt. Rieg

The Corrections Defendants contend that because McIntosh's negligence, failure to protect, and IIED claims fail as a matter of law, Captain Lewis, Deputy Superintendent Salamon, Lt. Detwiler, and Sgt. Rieg must be dismissed from this case if his Eighth Amendment conditions of confinement claims against them are also insufficient.  (ECF No. 43 at 11.)  They argue that the Eighth Amendment claims fail because McIntosh has failed to identify the dates and times he spoke with each defendant and alleges that he only complained once to Lt. Detwiler and Sgt. Rieg.

The Eighth Amendment's prohibition against cruel and unusual punishment guarantees that prison officials must provide humane conditions of confinement.  Although "[t]he Constitution 'does not mandate comfortable prisons,' . . . neither does it permit inhumane ones."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).  Thus, prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must "'take reasonable measures to guarantee the safety of the inmates[.]'"  *Id.* (quoting

*Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  To state a claim for an Eighth Amendment violation based on the conditions of confinement, a prisoner must plausibly allege that prison officials' acts or omissions denied him "the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 256 (3d Cir. 2010) (stating that the Eighth Amendment's prohibition of cruel and unusual punishment requires that prison officials provide "humane conditions of confinement").

> As a sister court recently explained:
>
> [P]laintiffs asserting conditions of confinement claims must demonstrate that they were subjected to an objectively, sufficiently serious deprivation that resulted in the denial of minimal civilized measures of life's necessities and that the defendant prison official was deliberately indifferent to inmate health or safety.  *Porter v. Pa. Dept. of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020) (citing *Farmer*, 511 U.S. at 834). A defendant is deliberately indifferent to the conditions of an inmate's confinement if he or she "knows of and disregards an excessive risk to inmate health or safety." *Id.* (quoting *Farmer*, 511 U.S. at 837). An evaluation of the context of the claim is necessary.  "Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single identifiable human need such as food, warmth, or exercise—for example a low cell temperature at night combined with a failure to issue blankets."  *Id.* at 304.

*Major v. Halligan*, No. 1:21-CV-00068, 2021 WL 6283944, at *10 (W.D. Pa. Nov. 17, 2021).

Here, McIntosh alleges that for fourteen days, he had to sleep with the lights on, was denied a mattress, bedding, footwear, toilet paper, a shower, a functioning toilet, cleaning supplies, and trips to the yard.  He also alleges that he was forced to live in a cell for seventy-two days in the dead of winter with a broken window that allowed a sizable amount of ice to come in.  During this period, he states that he complained to Captain Lewis, Deputy Superintendent Salamon, Lt. Detwiler, and Sgt. Rieg to no avail.  As a result, McIntosh claims, he sustained specified physical and mental injuries.

These allegations are sufficient to state an Eighth Amendment conditions of confinement claim against Captain Lewis, Deputy Superintendent Salamon, Lt. Detwiler, and Sgt. Rieg. *See Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (finding an Eighth Amendment violation where an inmate was forced to live in a cell for six days that was "frigidly cold cell, which was equipped with only a clogged drain in the floor to dispose of bodily wastes"); *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 374 (3d Cir. 2019) (finding an Eighth Amendment violation where "Mammana allege[d] that he was deprived of his clothing, provided only "paper like" coverings instead, denied bedding, and exposed to low cell temperatures and constant bright lighting for four days"). *See also Whitney v. Wetzel*, Civ. A. No. 3:CV-14-357, 2015 WL 632493, at *4 (M.D. Pa. Feb. 13, 2015) (defendants' personal observation of plaintiff being housed in an excessively cold cell and their subsequent failure to take any appropriate action in response to the inmate's complaint could allege defendants' personal involvement defendant in deliberate indifference to an apparent safety).

Thus, the motion to dismiss the Eighth Amendment conditions of confinement claim against Captain Lewis, Deputy Superintendent Salamon, Lt. Detwiler, and Sgt. Rieg will be denied.

I. Personal Involvement

The Corrections Defendants contend that former Secretary Wetzel, Deputy Superintendent Close, Superintendent Barry Smith, Captain Acey, Security Captain Sheeder, and Superintendent Estock must be dismissed because McIntosh has failed to adequately allege their personal involvement.

"The first step in evaluating a section 1983 claim is to identify the exact contours of the underlying right said to have been violated and to determine whether the plaintiff has alleged a

deprivation of a constitutional right at all." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (internal quotations and citations omitted).  "Next, a plaintiff must demonstrate a defendant's 'personal involvement in the alleged wrongs.'" *Id.* (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).  That is because only a person who "subjects, or causes to be subjected" another person to a civil rights violation can be held liable under § 1983.

To establish individual liability under section 1983, "[a] defendant must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode*, 845 F.2d at 1207.  There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2017), *rev'd on other grounds, Taylor v. Barkes*, 575 U.S. 822 (2015).  First, a supervisor may be held liable if he "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Santiago*, 629 F.3d at 129 & n. 5 (citing *A.M. ex rel. J.M.K. Luzerne Cnty.*, 372 F.3d 572, 586 (3d Cir. 2004)).  Second, a supervisor may be liable if he "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M.*, 372 F.3d at 586.

However, the alleged failure of a grievance officer to remedy the actions of another defendant does not demonstrate sufficient personal involvement to state a claim for relief.  Nor can a prisoner hold a prison official liable merely on the basis of a response to a grievance or request. *See Alexander v. Fritch*, Civ. A. No. 07-1732, 2010 WL 1257709, at *16 (W.D. Pa. Mar. 26, 2010) ("[p]laintiff ca[nn]ot impose liability against any of the [d]efendants based solely on his or her involvement with his correspondence, grievances and misconducts as such conduct is insufficient to establish personal involvement as required under 42 U.S.C. § 1983"), *aff'd*, 396 F.

App'x 867 (3d Cir. 2010); *Rogers v. United States*, 696 F. Supp. 2d 472, 488 (W.D. Pa. 2010) ("If a grievance official's only involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official").

In addition, since inmates do not have a constitutional right to a prison grievance system, *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 137-38 (1977), an inmate's dissatisfaction with a response to a grievance does not support a constitutional claim. *See Alexander v. Gennarini*, 144 F. App'x 924, 925 (3d Cir. 2005) (involvement in post-incident grievance process not a basis for § 1983 liability). *See also Williams v. Armstrong*, 566 F. App'x 106, 109 (3d Cir. 2014) ("Access to prison grievance procedures is not a constitutionally-mandated right").

### 1. Claims against Former Secretary Wetzel and Deputy Superintendent Close

The Corrections Defendants contend McIntosh's factual allegations that former Secretary Wetzel and Deputy Superintendent Close failed to accommodate individuals at SCI-Houtzdale with respiratory disabilities and did not properly train staff members, and that these actions and inactions resulted in McIntosh being sprayed with mace, are insufficient to plead their personal involvement. (ECF No. 43 at 6.) McIntosh responds that former Secretary Wetzel and Deputy Close implemented policies, procedures, and training that authorized officers to use mace against all inmates including those who suffer from severe respiratory illness and inmates with respiratory illnesses have died as a result. (ECF No. 45(3)(a)(1).)

The Court of Appeals has held that "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the

constitutional harm." *A.M. ex rel. J.M.K.*, 372 F.3d at 586 (internal citation and quotation omitted). "Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Knierp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996) (citation omitted). Customs are "practices of state officials . . . so permanent and well settled as to virtually constitute law." *Id.* (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.1996)). In other words, a custom is "an act 'that has not been formally approved by an appropriate decisionmaker' but that is so widespread as to have the force of law." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997)).

McIntosh has alleged that former Secretary Wetzel and Deputy Superintendent Close are responsible for the safety and security of individuals housed in their facility, and that they authorized the use of mace against individuals with respiratory disabilities despite the serious health risk it posed, leading to the death of some inmates. At this juncture, these allegations are sufficient to plausibly plead their personal involvement. Therefore, the motion to dismiss will be denied with respect to these defendants.

2.   Captain Acey

The Corrections Defendants further argue the factual allegations against Captain Acey, i.e., that he responded to Grievance No. 795404, are likewise insufficient to impose liability. (ECF No. 43 at 7.) McIntosh responds that the claims against Captain Acey stem from him implementing a cover-up scheme and this scheme constituted an ongoing violation because he was confronted with a situation he could directly rectify and opted not to do so. (ECF No. 45(3)(c).)

Here, McIntosh has pleaded that Captain Acey assisted in a cover-up scheme with respect to Grievance No. 795404 and denied McIntosh the video footage he needed to pursue his claims

against certain officers.  (ECF No. 38(6)(d)(1).)  As already stated, if a grievance official's only involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official. *Rogers v. United States*, 696 F. Supp. 2d 472, 488 (W.D. Pa. 2010).  This is true even where a reviewing officer is accused of fabricating or destroying evidence.  *See Ashford v. Hawkinberry*, Civ. A. No. 14-1718, 2017 WL 4269493, at *12 (W.D. Pa. Sept. 26, 2017).

Here, the grievance was submitted on March 19, 2019, which is the same day McIntosh was moved out of the cell at issue.  Thus, the violation was no longer ongoing at the time of Captain Acey's review.  For these reasons, McIntosh's claim against Captain Acey will be dismissed with prejudice as McIntosh has not and cannot plausibly plead Captain Acey's personal involvement.

### 3.  Security Captain Sheeder and Superintendent Estock

The Corrections Defendants raise similar arguments as to Security Captain Sheeder and Superintendent Estock.   Specifically, they argue Security Captain Sheeder lacks personal involvement because it was limited to denying McIntosh camera footage.  (ECF No. 43 at 7.)  With respect to Superintendent Estock, they argue that McIntosh's allegations that Superintendent Estock reviewed Grievance No. 898642 and implemented a cover-up scheme are insufficient as a matter of law to impose liability.  (*Id.*)  McIntosh reiterates in his response that Captain Sheeder and Superintendent Estock unjustifiably denied his request for the audio and video recordings in Grievance No. 898642 and did so to "cover[-]up the defendants['] wrong doings."  (ECF No. 45 ¶¶ 3(d), 3(e).)  Furthermore, because their conduct has impaired his ability to pursue the instant action, he argues that the violation is "ongoing."  (*Id.*)

McIntosh's claims against Security Captain Sheeder and Superintendent Estock fail because like Captain Acey, the allegations against them are limited to the post-violation grievance

process.  Accordingly, the Corrections Defendant's motion will be granted insofar as it relates to the personal involvement of Security Captain Sheeder and Superintendent Estock and the claims against them will be dismissed with prejudice.

       4.   Superintendent Barry Smith

Lastly, the Corrections Defendants argue McIntosh's allegations that Superintendent Barry Smith failed to accommodate individuals at SCI-Houtzdale with respiratory disabilities and did not properly train staff members, and that these actions and inactions resulted in McIntosh being sprayed with mace, are insufficient to state a claim of personal involvement.  (ECF No. 43 at 6.) Additionally, they contend that McIntosh has not adequately alleged personal involvement because McIntosh has not provided the specific dates that he complained to Superintendent Barry Smith. Lastly, with respect to the allegations pertaining to the grievances, the Corrections Defendants argue that there was no ongoing violation at the time that McIntosh filed his grievance.  (*Id.*)

McIntosh responds that all of his claims against Superintendent Barry Smith stem from his failure to accommodate the individuals housed in SCI-Houtzdale with respiratory disabilities by failing to implement appropriate use of force training for inmates with respiratory issues.  (ECF No. 45 ¶ 3(b)(1).)   He further responds that he complained to Superintendent Barry Smith numerous times about the "hazardous unsanitary cell conditions" he was housed in and Superintendent Barry Smith, nevertheless, denied his grievances as part of a cover-up scheme.  (*Id.* ¶ 3(b)(2).)

Here, McIntosh has alleged that former Superintendent Barry Smith implemented policies and/or procedures with respect to use of force that did not take into account the danger mace can impose with respect to prisoners with a respiratory disability.  He further alleges that he was injured as a result of this policy as were other inmates. He also pleads that he complained to Superintendent

Barry Smith on numerous occasions that his cell was cold due to the crack in the window, that he was forced to walk barefoot in freezing cold contaminated water, that he was having issues as a result with his feet, and that he continued to have issues with his asthma due to mace having been sprayed in his cell.  Accordingly, the Corrections Defendants' motion to dismiss Superintendent Barry Smith for lack of personal involvement will be denied as McIntosh has pleaded a plausible claim against him.

J.   Fourteenth Amendment Claims[5]

Lastly, the Corrections Defendants argue that McIntosh's Fourteenth Amendment claims must be dismissed because they are based on the same factual allegations underlying his Eighth Amendment claims and the Fourteenth Amendment offers him no greater protection than the Eighth Amendment.  (ECF No. 43 at 16-17.)  McIntosh again responds by asserting that the Corrections Defendants' motion with respect to these claims is "frivolous."  (ECF No. 45 ¶ 9.)

The Supreme Court of the United States has made clear that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'"  *Albright v. Oliver*, 510 U.S. 266, 274 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  Here, the Corrections Defendants correctly note that the Eighth Amendment provides the explicit source of constitutional protection with respect to the claims challenging his conditions of confinement, the alleged use of

---

[5] Although McIntosh appears to be arguing he had a Fourteenth Amendment right to privacy with respect to his legal documents, other courts have found no such right exists under similar facts. *See Ivy v. Wetzal*, Case No. 1:20-cv-00265-RAL, 2021 WL 4479721, at *12 (W.D. Pa. Sept. 30, 2021) (finding there is no per se reasonable expectation of privacy in legal papers sent to a librarian for copying and that the librarian had not violated the plaintiff's Fourteenth Amendment rights by showing his papers to an unlicensed inmate law clerk).

excessive force, and the failure to intervene.  Thus, the Eighth Amendment, rather than the Fourteenth Amendment, is applicable to these claims.  *See, e.g., Sadelmyer v. Peltzer*, No. 2:12-cv-1785, 2013 WL 4766517, at *6 (W.D. Pa. Sept. 4, 2013) (because the Eighth Amendment provided an explicit source of protection, [p]laintiff's claim was preempted by the Eighth Amendment and should not be analyzed as a substantive due process claim under the Fourteenth Amendment).

As such, McIntosh's Fourteenth Amendment claim fails as a matter of law and must be dismissed with prejudice.

### V.   Leave to Amend

When dismissing a civil rights case for failure to state a claim, a court must give a plaintiff a chance to amend a deficient complaint, irrespective of whether it is requested, unless doing so would be "inequitable or futile."  *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007).  "An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted."  *Alston v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000).

For the reasons discussed, amendment would be futile as to McIntosh's official capacity, IIED, breach of contract, and Fourteenth Amendment claims, and they will be dismissed.  Also futile are his claims against Captain Acey, Security Captain Sheeder, and Superintendent Estock, as well as his First Amendment claim against C.O. Stivison, his failure to intervene claims except those against Lt. Veihdeffer, Nurse, and the Jane and John Doe members of the CERT Team, and his negligence claims against all Corrections Defendants but Librarian Weaver and C.O. Rietscha.  Therefore, McIntosh will not be given leave to further amend his complaint.

**VI.**    **Conclusion**

For these reasons, the Corrections Defendants' partial motion to dismiss (ECF No. 42), will be granted in part and denied in part.  An appropriate order will follow.


BY THE COURT:


Dated: August 11, 2022                      s/Patricia L. Dodge
                                            PATRICIA L. DODGE
                                            United States Magistrate Judge


cc:    Keenan Mcintosh
       Mv-9011
       SCI Phoenix
       P.O. Box 244
       1200 Mokychic Drive
       Collegeville, Pa 19426