## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KEENAN MCINTOSH,      )
                       )
      Plaintiff,      )
                       )
    vs.             )   Civ. A. No. 2:20-1957
                       )
                       )
JOHN E. WETZEL Secretary of  )
Corrections, et al.,    )
                       )
      Defendants.     )

### MEMORANDUM OPINION[1]

Keenan McIntosh ("McIntosh"), who is proceeding *pro se*, is a state prisoner who at all relevant times was housed either at the State Correctional Institution ("SCI") at Houtzdale or SCI-Pine Grove.[2] McIntosh's remaining claims are brought under the First and Eighth Amendments and Pennsylvania common law against former Secretary of Corrections John E. Wetzel, Superintendent Barry Smith, Deputy Superintendent Close, Deputy Superintendent B.J. Salamon, Certified Emergency Response Team members Matthew Cox, James W. Oliver, Brian McAllister and John Firment (the "CERT Team Defendants"), Nurse Deborah Askey, Captain Lewis, Lt. Detwiler, Lt. H. Veihdoffer, Sgt. Rieg, Correctional Officers ("C.O.") Stivison, Miller and Rietscha, and Librarian B. Weaver, all in their individual capacities.

Pending before the Court are cross-motions for summary judgment by McIntosh and Defendants. (ECF Nos. 98, 106.) For the reasons discussed below, McIntosh's motion will be denied and Defendants' motion will be granted in part and denied in part.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. Thus, the undersigned has the authority to decide dispositive motions and enter final judgment.

[2] McIntosh is currently confined at SCI-Phoenix.

I. **Relevant Procedural History**

After his motion to proceed in forma pauperis was granted, McIntosh's Complaint was docketed on January 8, 2021.  (ECF No. 7.)  All Defendants moved to dismiss, and McIntosh responded by filing an Amended Complaint.  (ECF Nos. 19, 27.)  Defendants then filed a motion for a more definite statement. The Court granted their motion and ordered McIntosh to file a Second Amended Complaint.  (ECF Nos. 29, 34.)  McIntosh did so on August 19, 2021.  (ECF No. 34.)

Defendants again moved to dismiss. (ECF No. 35.)  McIntosh filed a response in opposition which included substantial additional facts.  (ECF No. 38.) The Court denied the motion to dismiss without prejudice, noting that it would construe McIntosh's response as a supplement to his Second Amended Complaint. (ECF No. 41.)  As a result, it ordered Defendants to plead or otherwise respond to the Second Amended Complaint, as supplemented, by January 22, 2022.  (*Id.*)

The Second Amended Complaint did not specifically name CERT team members Cox, Oliver, McAllister or Firment or Nurse Askey but instead named them as John and Jane Doe defendants.  Subsequently, the Court granted leave to McIntosh to file a Third Amended Complaint in which he specifically identified CERT team members Cox, McAllister and Firment and Nurse Askey as defendants.  (ECF No. 84.)  As noted in the Court's Order granting leave to file the Third Amended Complaint, the Third Amended Complaint is essentially a copy of the Second Amended Complaint in all other respects.  (*Id.* p. 3.)  Neither the Second nor Third Amended Complaint is verified.

Defendants subsequently filed a partial motion to dismiss (ECF No. 42) to which McIntosh responded in opposition.  (ECF No. 45.)  On August 11, 2022, this Court granted in part and denied in part Defendants' motion.  The Court dismissed with prejudice all of McIntosh's claims against

Defendants in their official capacities; all claims against Defendants Captain Acey, Security Captain Sheeder, and Superintendent Estock; McIntosh's breach of contract, intentional infliction of emotional distress, and Fourteenth Amendment claims; the First Amendment claim against Defendant C.O. Stivson; the failure to protect claims against all Defendants other than Lt. Veihdoffer, Nurse Askey and CERT team members Cox, Oliver, McAllister and Firment; and McIntosh's negligence claims against all Defendants other than Librarian Weaver and C.O. Rietscha. (ECF No. 47.)

Thus, the following claims remain in this case: (1) McIntosh's Eighth Amendment "deliberate indifference" claim against Secretary Wetzel, Superintendent Smith and Deputy Superintendent Close; (2) McIntosh's failure to protect or intervene claim against Lt. Veihdoffer, Nurse Askey and the CERT Team Defendants; (3) McIntosh's Eighth Amendment claim against Superintendent Smith, Captain Lewis, Deputy Superintendent Salamon, Lt. Detwiler, Sgt. Rieg, C.O. Stivison, C.O. Miller and C.O. Hershberger[3]; (4) McIntosh's First Amendment retaliation claim against Librarian Weaver and C.O. Rietscha; and (5) McIntosh's negligence claim against Librarian Weaver and C.O. Rietscha. (*Id.*)

The parties engaged in discovery after resolution of the partial motion to dismiss. After the close of discovery, McIntosh filed a Motion for Summary Judgment, Brief in Support, and a Statement of Undisputed Facts and Exhibits to which Defendants responded by filing a Brief in Opposition and Responses to McIntosh's Statement of Undisputed Facts and Exhibits. (ECF Nos. 98, 100, 101, 104, and 105.) After seeking and being granted an extension of time, Defendants

---

[3] While not specifically referenced in the order granting in part and denying in part Defendants' partial motion to dismiss, Defendants Smith, Stivison, Miller and Hershberger are named in this claim and were not dismissed as defendants. Defendants' Brief in Support of its Motion for Summary Judgment seeks judgment in their favor. Therefore, the Court necessarily has included these defendants in its analysis of this claim.

also filed a Motion for Summary Judgment accompanied by a Brief in Support, a Concise Statement of Material Facts and an Appendix containing exhibits in support of such motion on September 21, 2023.  (ECF Nos. 106, 107, 108 and 109.)  McIntosh filed a Response to Defendants' Concise Statement of Material Facts on October 20, 2023.  (ECF No. 112.)  Thus, both motions are fully briefed and ready for disposition.[4]

## II.  **Relevant Facts**[5]

As of January 8, 2019, McIntosh was housed in the mental health unit of SCI-Houtzdale. (ECF Nos. 100, 105, 108 and 112 ¶ 1.)  That day, the CERT Team Defendants, Defendant Nurse Askey and Defendant Lt. Veihdoffer attempted to transport him to the Restricted Housing Unit ("RHU").  McIntosh refused to comply with their orders.  (ECF Nos. 108, 112 ¶ 2.)  As a result, a planned use of force was used in accordance with Department of Corrections ("DOC") policy.  (*Id.* ¶ 3.)  Nurse Askey medically cleared McIntosh prior to the planned use of force and approved the use of Oleorsein Capsicum ("OC") on McIntosh.  (ECF Nos. 100, 105 ¶ 2; ECF No. 108, 112 ¶ 4.) McIntosh claims that he "never should [have] been medically cleared to be sprayed with OC spray because he suffers from a life-threatening respiratory deficiency known as asthma." (ECF No. 100 ¶ 2.) While it is undisputed that McIntosh was diagnosed with "mild intermittent asthma" on February 27, 2017 (ECF No. 100, 105 ¶ 24; ECF No. 108, 112 ¶ 7), he has not produced any

---

[4] Neither McIntosh's Concise Statement (ECF No. 100) nor his Responsive Concise Statement (ECF No. 112) are verified.  The Declaration he submitted in support of his Motion for Summary Judgment includes a verification that the "foregoing" is true and correct.  The Declaration consists of legal conclusions and a description of his claimed damages.  However, since it also references his statement of facts, and in light of his *pro se* status, the Court will construe his Concise Statement as verified.  At the same time, however, because his subsequently filed Responsive Concise Statement is not verified, any facts set forth in Defendants' Concise Statement will be deemed to be admitted unless disputed in McIntosh's Concise Statement.

[5] Except where indicated, the facts are undisputed.  As will be discussed below, however, there are a number of disputed facts, many of which are not relevant to the outcome here.

medical evidence that his asthma was life-threatening or that he should not have been medically cleared to be sprayed.

The parties disagree about how many times OC spray was administered although it is undisputed that C.O. McCallister sprayed McIntosh at least twice in order to gain compliance with orders. (ECF Nos. 100, 105 ¶ 3; ECF No. 108, 112 ¶ 5.) McIntosh claims that after he was sprayed with OC spray the second time, he had trouble breathing and seeing. (ECF No. 100 ¶ 3.)[6]

McIntosh was then escorted to a cell in the RHU where a strip search was conducted. He claims that while being escorted to the RHU, "one of the defendants" told "one of the other defendants" to "[p]ut him in that fucked up cell," and "[g]et that mattress out of there." (ECF No. 100 ¶¶ 4, 5.) Defendants deny making any such statements. (ECF No. 105 ¶ 4.) Upon his arrival at cell number 1007, he was placed on top of the metal bedframe in the cell and ordered to open his eyes, at which point he claims he was sprayed with OC a third time by Nurse Askey. (*Id.* ¶ 6.) Defendants counter that she did not do so; rather, McIntosh rejected her efforts to attempt to flush his eyes with water. (ECF No. 104 ¶ 6.)

The interactions with McIntosh on January 8, 2019 were documented on video. (ECF Nos. 108, 112 ¶9). The video is marked as Exhibit E to Defendants' motion. The Court has reviewed the video of which there are four segments. The first briefly depicts preparation for the use of force but cuts off.[7] The second also depicts preparation in a hallway and the presence of Lt. Veihdoffer, Nurse Askey and the CERT Team Defendants. Lt. Veihdoffer states that: McIntosh has ripped his mattress apart and is lying on the floor in front of the cell door; he has refused to comply with

---

[6] Defendants have denied this statement based upon lack of information. (ECF No. 105 ¶ 3.)
[7] As reflected on several segments, the camera inadvertently turned off several times due to "insufficient data." However, as will be discussed, the incident at issue is fully recorded. While McIntosh claims that the video footage was tampered with, he has submitted no evidence to support this allegation and the Court did not view any signs of tampering.

orders; Captain Miller has authorized the use of force; and Nurse Askey has cleared the use of OC spray because McIntosh has no medical restrictions.  Further, all participants confirmed that they have been trained and are qualified in the use of force.  The third video segment is brief and shows these Defendants approaching McIntosh's cell, advising him that OC spray will be used and directing him to come to the cell door to be handcuffed. At this point the camera again turns off.

The fourth video shows the matters at issue. Lt. Veihdoffer notes that the camera had previously turned off.  Defendants arrive at the cell door.  Plaintiff, who appears to be naked, can be seen holding a mattress between himself and the door.  OC spray is administered.  He does not comply with orders to put the mattress down.   A second spray is administered, after which McIntosh places his hands in the cell slot and is handcuffed.  He states that he needs to clean his face.  A smock is placed on him and he is transported to a cell and strip searched.  He is then told that a nurse is going to flush his eyes and to hold his head up.  McIntosh says that he can't open his eyes and resists.  Nurse Askey attempts to flush his eyes and tells him that she is using eye wash/water.  McIntosh says he doesn't believe it and continues to reject her attempts. As a result, she is unable to flush his eyes.  McIntosh is not sprayed with OC spray a third time.  The video does not reflect the conversation between the unidentified defendants that McIntosh alleges to have occurred while he was being transferred to the RHU.  Rather, the audio merely reflects directional orders as he was being transported. The video continues for several minutes after McIntosh was placed in the RHU cell.  He can be seen through the cell window bent over for a period of time and then drinking water and splashing his face with water from a drinking fountain in the cell.  The video ends with a debriefing by Defendants.

According to McIntosh, Defendants violated Pennsylvania DOC policy DC-ADM 201, which states that use of force is supposed to stop once order is restored and force is not an

authorized means of punishment or revenge. As Defendants note, there is no evidence in the record that any force was used as punishment or revenge.[8]

The parties agree to certain basic facts. McIntosh was housed in cell 1007 until March 19, 2019, a total of 71 days. (ECF Nos. 100, 105 ¶ 17.) There was a crack in the window of the cell on the date McIntosh was placed in the cell. (*Id.*) His cell flooded on January 9, 2019 due to a clogged toilet. (ECF Nos. 108, 112 ¶ 11.) A work order was issued to repair the clogged toilet. (ECF Nos. 100, 105 ¶ 18.)

McIntosh claims he was denied bedding materials; denied clothing for two weeks; that the light in cell 1007 was left on for two weeks; that he was denied yard privileges, showers and cleaning supplies; that he was forced to be placed in his cell naked; that his cell continuously flooded; that his complaints of being cold to staff due to the cracked window were ignored; and that he was denied medical care. (ECF No. 100 ¶¶ 5, 7, 9, 16-23.)

In his verified statement of facts, McIntosh asserts that he brought these issues to the attention of Defendants Hershberger and Miller and made a request to move to another cell, but they only made jokes about how cold the cell was and did nothing to alleviate the conditions in his cell. (ECF No. 100 ¶ 28.) Defendants deny these allegations. (ECF 105 ¶ 28.) McIntosh further states that he also brought these conditions to the attention of Defendants Lewis and Salamon, as well as Defendants Stivison, Reig and Detwiler but nothing was done to alleviate these conditions or move him to another cell. (ECF No. 100 ¶¶ 29, 30.) Again, Defendants merely deny that these conversations occurred. (ECF 105 ¶¶ 29, 30.)

---

[8] In his Responsive Concise Statement, McIntosh admits that he refused to comply with orders to be transported to the RHU and that "a planned use of force was used in accordance to [sic] department of corrections policy." (ECF No. 112 ¶¶ 1, 2.)

Defendants dispute that McIntosh was denied bedding materials and cite to Exhibit D (ECF No. 101-10) in support, which is a Security Level 5 Housing Unit Inmate Activity Restriction form for McIntosh. This document contains a list of cell restrictions, including use of handcuffs, treatment belt and/or leg irons, but does not state that bedding was restricted in the cell. (ECF No. 105 ¶ 5; and ECF No. 101-10.) Defendants further dispute that McIntosh was denied medical care or that he was denied clothing for two weeks. They also assert that there is no record evidence that he was denied showers, yard privileges, or cleaning supplies, or that his cell was continuously flooded or that he ever complained of being cold to staff. (ECF No. 105 ¶¶ 5, 7, 9, 16-23.) Further, they assert, camera footage shows that the light was not left on continuously for two weeks. (*Id.* at ¶ 22.)

McIntosh asserted two grievances while he was incarcerated at SCI-Houtzdale. These grievances were submitted on March 19, 2019 (Grievance No. 792484) and April 5, 2019 (No. 795404). Both claimed that DOC officials engaged in cruel and unusual punishment and negligent behavior towards McIntosh by housing him in a cold cell for 71 days, refusing to move him out of the cell and making fun of him about the condition of the cell. (ECF Nos. 101-10 and 101-14.) Both grievances were initially denied. (ECF No. 101-10 p. 2; and ECF No. 101-14 p. 2.) Ultimately, Defendant Superintendent Smith reviewed Grievance Nos. 795404 and 792494 and upheld their denials. (ECF Nos. 101-11 p. 4; and 101-14 p. 4.)

McIntosh remained at SCI-Houtzdale until he was transferred to SCI-Pine Grove on March 11, 2020. (ECF Nos. 100, 105 ¶ 16.) He claims that on October 22, 2020, he sent materials that he needed for an anticipated petition for allowance of appeal to the library to be copied by

Defendant Weaver.  (ECF Nos. 100, 105 ¶ 44; ECF No. 108, 112 ¶ 18.)[9]  Some copies were made but delivered to the incorrect cell on October 27, 2020.  (*Id.*)  When they were finally delivered to him, McIntosh claims, there were pages missing or not copied properly which caused his petition for allowance of appeal to the Pennsylvania Supreme Court to be denied.  (ECF No. 98 pp. 13-15.) Defendants Weaver and Rietscha do not dispute that McIntosh's copies were initially mis-delivered but dispute that any of McIntosh's legal materials were missing when they were returned to him. SCI-Pine Grove reimbursed McIntosh of the cost of the copies in the amount of $15.00. (*Id.*) The Supreme Court of Pennsylvania later denied McIntosh's petition for allowance of appeal. (ECF No. 105 ¶¶ 44, 45.)

McIntosh claims that he has permanent damage to his left eye as a result of being sprayed with OC. He was seen on October 5, 2021 by Dr. Robert Brynien, OD, for an optometric examination. Dr. Brynien concluded that his eyes were normal/clear and there was no change in his prescription.  (ECF No. 108 ¶ 20; ECF No. 101-1, Ex. H.)  Thus, Defendants contend that McIntosh's allegation that he sustained permanent damage to his left eye as a result of the OC spray that was administered on January 8, 2019 is unsupported by his medical records or any other evidence.

McIntosh also claims that he sustained damage to his feet as a result of the flooding of his cell. In addition, he claims to have suffered and continues to suffer psychological damages and

---

[9] The Court takes judicial notice the Pennsylvania Supreme Court's docket for *Commonwealth v. McIntosh*, No. 287 EAL 2020, which is available online at https://ujsportal.pacourts.us. A review of this docket reflects that McIntosh filed a Petition for Allowance of Appeal on September 16, 2020, before the events that he describes. He filed an Application for Leave to File an Amended Petition for Allowance of Appeal on March 9, 2021 which was denied on April 6, 2021. McIntosh then filed an application for reconsideration on April 13, 2021 that was denied on May 6, 2021.

that he has sustained undefined economic losses.  (ECF No. 100, ¶¶ 8, 9, 10, 11, 25, 33, 35, 44, 45.)

### III.   <u>Legal Standard</u>

As the Federal Rules of Civil Procedure provide, summary judgment must be granted if there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence which shows the lack of a genuine issue of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  *Id.* (internal citation omitted). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor.  *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cty. of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

As the Court has been presented with cross motions for summary judgment, "the Court must consider the motions separately, and view the evidence presented for each motion in the light most favorable to the nonmoving party." *Borrell v. Bloomsburg Univ.,* 63 F.Supp. 3d 418, 433

(M.D. Pa. 2014) (citation omitted).  If both parties fail to meet their burden on a specific issue, the Court must deny both motions.  *Facenda v. N.F.L. Films, Inc.,* 542 F.3d 107, 1023 (3d. Cir. 2008.)

**IV.**    **Discussion**

    A.    Eighth Amendment Claim against Former Secretary Wetzel, Deputy Superintendent Close and Superintendent Smith

Both McIntosh and Defendants move for summary judgment on the 42 U.S.C. § 1983 "deliberate indifference" claims asserted against former Secretary Wetzel, Deputy Superintendent Close, and Superintendent Smith.  In the unverified Second Amended Complaint, McIntosh alleges that that former Secretary Wetzel, Deputy Superintendent Close and Superintendent Smith are responsible for the safety and security of individuals housed at their facilities and are liable for failing to accommodate individuals at SCI-Houtzdale with respiratory disabilities "in use of force training as well as through policies and procedures." (ECF No. 86 pp. 19-20.) Further, he alleges that they violated his Eighth Amendment rights because they knew he had serious medical needs. (*Id.*).

In his Statement of Undisputed Facts, McIntosh repeats these allegations. (ECF No 100 ¶ 13.) He further states that they failed to "adequately adjust their use of force training, policies, procedures, and practices to accommodate people with respiratory disabilities at SCI Houtzdale." (ECF No 100 ¶ 12.) In his brief in support of his motion, he also alleges that these defendants did not properly train staff members; implemented policies, procedures, and training that authorized officers to use OC spray against all inmates, including those who suffer from severe respiratory illness; and that inmates with respiratory illnesses have died as a result.  (ECF No. 101 pp. 6-7.) Former Secretary Wetzel, Deputy Superintendent Close and Superintendent Smith assert in their response to McIntosh's statement of facts that the majority of these facts are legal conclusions.

In Defendants' motion for summary judgment, they argue that McIntosh's claim fails because he has failed to establish the personal involvement of Wetzel, Close or Smith.

"The first step in evaluating a section 1983 claim is to identify the exact contours of the underlying right said to have been violated and to determine whether the plaintiff has alleged a deprivation of a constitutional right at all." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (internal quotations and citations omitted). "Next, a plaintiff must demonstrate a defendant's 'personal involvement in the alleged wrongs.'" *Id.* (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). That is because only a person who "subjects, or causes to be subjected" another person to a civil rights violation can be held liable under § 1983.

To establish individual liability under section 1983, "[a] defendant must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode*, 845 F.2d at 1207. There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2017), *rev'd on other grounds, Taylor v. Barkes*, 575 U.S. 822 (2015). First, a supervisor may be held liable if he "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Santiago*, 629 F.3d at 129 & n. 5 (citing *A.M. ex rel. J.M.K. Luzerne Cnty.*, 372 F.3d 572, 586 (3d Cir. 2004)). Second, a supervisor may be liable if he "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M.*, 372 F.3d at 586.

The Court of Appeals has held that "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the

constitutional harm." *A.M. ex rel. J.M.K.*, 372 F.3d at 586 (internal citation and quotation omitted). "Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Kniepp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996) (citation omitted). Customs are "practices of state officials . . . so permanent and well settled as to virtually constitute law." *Id.* (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.1996)). In other words, a custom is "an act 'that has not been formally approved by an appropriate decisionmaker' but that is so widespread as to have the force of law." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997)).

A review of the record reflects the absence of any facts that reflect that Former Secretary Wetzel, Deputy Superintendent Close or Superintendent Smith had any specific knowledge of McIntosh's conduct or his purported medical condition. Further, there is no record evidence that any of these Defendants had any personal involvement in the decision to deploy OC spray or the selection of the cell in which McIntosh was placed. And there is no evidence that either Defendant Wetzel or Defendant Close had any knowledge or personal involvement regarding the conditions in that cell.[10] There are no facts in the record that suggest that they had contemporaneous knowledge or acquiesced in any subordinate's actions as it relates to the incidents about which McIntosh complains. Thus, there is no evidence of their personal involvement in the alleged violations of McIntosh's civil rights.

Moreover, there is no evidence that any of these defendants established and maintained a policy, practice or custom which directly caused any constitutional harm. Notably, McIntosh

---

[10] The Eighth Amendment conditions of confinement claim against Defendant Smith, in which McIntosh alleges that Smith and other Defendants were advised of his cell conditions and took no action, will be addressed separately later in this opinion.

makes certain admissions in his response to Defendants' Concise Statement of Material Facts.  He acknowledges that after he refused to comply with orders, a planned use of force was used in accordance with Department of Corrections policy. (ECF No. 112 ¶¶ 2, 3.) He further admits that he was medically cleared for the use of force but should not have been so cleared because he has a "life threatening condition."  At the same time, he acknowledges that he has mild intermittent asthma and furnished no evidence, medical or otherwise, that his asthma was life threatening or that OC spray should not have been administered due to his condition.[11]

Thus, there is no evidence that reflects that any of these defendants were deliberately indifferent to a serious medical need of McIntosh. Such evidence is necessary in order to establish a constitutional violation.  *See, e.g., Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *Monmouth Cty. Correctional Institution Inmates v. Lanzaro,* 834 F. 2d 326, 346-47 (3d. Cir. 1987). The record includes no evidence that any of these defendants intentionally interfered with, delayed or denied any necessary medical treatment for McIntosh, let alone that they had any specific knowledge about the incident of January 8, 2019.  Moreover, contrary to his allegations of having a "life threatening" condition, McIntosh had "mild intermittent asthma," and there is no evidence that he sustained any serious injuries or had any serious medical need, let alone one that went untreated.

---

[11] In furtherance of his contention that these defendants established an unconstitutional policy that violated his civil rights, McIntosh attached several news articles about a lawsuit in which a prisoner housed by the DOC died after he was allegedly dosed with an excessive amount of OC spray and received inadequate medical treatment (ECF No.101-18.)  As the evidence demonstrates, however, this occurred at a different correctional institution and none of these Defendants are alleged to have any involvement in this matter. More importantly, the evidence of record demonstrates that McIntosh did not receive an excessive dose of OC spray and sustained no injuries as a result other than temporarily sustaining the burning of his eyes and difficulty breathing, neither of which required medical treatment.  Thus, the incident referenced in these articles has no relevance to McIntosh's claims.

Because there are no genuine issues of material fact that support McIntosh's claim, his motion for summary judgment will be denied and Defendants' motion will be granted with respect to Defendants Wetzel, Close and Smith. These Defendants are entitled to judgment in their favor with respect to McIntosh's "deliberate indifference" claim against them.

   B.   <u>Failure to Protect/ Intervene Claims Against Lt. Veihdoffer, Nurse Askey and CERT Team Members Cox, Oliver, McAllister and Firment</u>

McIntosh's failure to protect/intervene claims against Defendants Lt. Veihdoffer, Nurse Askey, and CERT team members Cox, Oliver, McAllister and Firment appear to stem from several incidents.  McIntosh first claims that these Defendants failed to protect him and/or intervene when they used OC spray on him despite an alleged diagnosis of severe asthma.  (ECF No. 98 pp. 15-17.)  He also claims they failed to protect him and/or intervene by denying medical treatment for his eye after the OC spray was administered, as a result of which he allegedly suffered permanent damage.  (*Id.*)  McIntosh further argues that these Defendants failed to protect him and/or intervene by placing him in a cell that was unreasonably cold and did not have a mattress or bedding.  (*Id.*)

In moving for summary judgment on this claim, Defendants Lt. Veihdoffer, Nurse Askey and CERT team members Cox, Oliver, McAllister and Firment argue that such claims are either not supported or are contradicted by the record evidence, including McIntosh's medical records and the video that was taken of the incident.  (ECF No. 104 p. 6.)

It is well-established that any duty to intervene is limited to situations involving excessive force.  *Armstrong v. Furman*, No. 3:19-CV-141, 2020 WL 5545270, at *7 (W.D. Pa. Sept. 16, 2020).  "To be directly liable under a failure to intervene theory, (1) the plaintiff must have demonstrated that her underlying constitutional rights were violated; . . . (2) the officer had a duty to intervene; and (3) the officer must have had a realistic and reasonable opportunity to intervene."  *Klein v. Madison*, 374 F. Supp. 3d 389, 419 (E.D. Pa. 2019).

When prison officials are accused of using excessive force, as court must determine "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992).  The factors to be considered include the need for force, the relationship between that need and the force used; the extent of any injury sustained; the threat to the safety of staff and inmates and any efforts made to reduce or eliminate the need for force. response.'"  *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000).

In support of his argument on this claim, McIntosh asserts that while being escorted to the RHU, an unidentified defendant, but alleged to be either Lt. Veihdoffer, Nurse Askey or CERT team members Cox, Oliver, McAllister or Firment, told one of the others to "[p]ut him in that fucked up cell", to "[g]et that mattress out of there," and he was denied bedding materials.  (ECF Nos. 100 ¶¶ 4, 5.)  McIntosh also claims that he was placed on top of the metal bedframe in cell number 1007, ordered to open his eyes and was sprayed with OC spray for a third time by Nurse Askey.  (*Id.* ¶ 6.)  As previously discussed, Defendants dispute these allegations.

In considering this issue, the Court has reviewed the video of the incident (ECF No. 111) and McIntosh's medical records (ECF No. 101-9 and 101-16).

Because there is video evidence regarding the encounter between McIntosh and Defendants Lt. Veihdoffer, Nurse Askey and CERT team members Cox, Oliver, McAllister and Firment, the Supreme Court's holding in *Scott v. Harris*, 550 U.S. 372 (2007), is significant to the analysis of this claim.  In *Scott*, a motorist who was fleeing from police contended that he was not driving recklessly.  However, a videotape of the events at issue flatly contradicted his allegations. *Id.* at 379-80.  The Court held that: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. *See also Morgan v. Borough of Fanwood*, 680 F. App'x 76, 80 (3d Cir. 2017) ("when, as here, there is reliable video footage of the facts in the record, we view the facts in the light as depicted by the videotape.")

Here, the video completely contradicts McIntosh's claim. The use of force was neither malicious nor done with the intent to cause harm. Rather, this was a planned cell extraction due to McIntosh's non-compliant conduct to which he admits. McIntosh was asked twice to come to the cell door but refused to do so and warned that OC would be used if he failed to comply.  The force used was proportional to the need for use of force.  In order to gain compliance, McIntosh was sprayed twice with OC spray in accordance with DOC policy. Moreover, the audio portion of the video, which includes the entire encounter, does not include any of the statements that were allegedly made to McIntosh during his transfer to cell 1007, including any alleged comments about the condition of cell 1007 or removing the mattress from the cell.

In addition, McIntosh's medical records indicate he was diagnosed with "mild intermittent asthma" not severe asthma.  (ECF No. 101-9 p. 3.)  He does not refute that he was medically cleared for the administration of OC spray and there is no evidence that he sustained any harm as a result. McIntosh rejected Nurse Askey's multiple attempts to flush his eyes with water once he was transported to cell 1007. The record includes no evidence of any serious injury as a result of the extraction.[12]

---

[12] As previously discussed, in the absence of any supporting medical evidence, McIntosh's statement that he had trouble breathing and seeing after he was sprayed does not support his claim of a serious medical need that went untreated.

McIntosh also alleges that the conditions of his confinement in cell 1007 over the next several months violated his civil rights by failing to protect him. However, there is no record evidence that any of these Defendants selected the cell in which he was confined or had any role, responsibility, or knowledge about the conditions to which he was allegedly subjected over the next several months.

"To state a viable failure-to-protect claim, the plaintiff must establish that: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendant was deliberately indifferent to that substantial risk; and (3) the defendant's deliberate indifference caused the plaintiff to suffer harm." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012), *abrogated on other grounds by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020); *Farmer,* 511 U.S. at 834.

Absent Defendants' role in the decision about the specific cell placement or on-going cell conditions, there is no evidence of their deliberate indifference to any substantial risk of harm.  As such, they cannot be liable for any claimed civil rights violation that is based upon McIntosh's cell conditions.

For these reasons, McIntosh's motion for summary judgment will be denied and Defendants' motion for summary judgment will be granted regarding this claim.  Judgment will be entered in favor of Defendants Lt. Veihdoffer, Nurse Askey and CERT team Members Cox, Oliver, McAllister and Firment and against McIntosh.

C.  McIntosh's Eighth Amendment Claims against Superintendent Smith, Captain Lewis, Deputy Superintendent Salamon, Lt. Detwiler, Sgt. Rieg, Correctional Officer Stivison, Correctional Officer Hershberger and Correctional Officer Miller

Both McIntosh and Defendants move for summary judgment on his Eighth Amendment claims which McIntosh has asserted against Superintendent Smith, Captain Lewis, Deputy Superintendent Salamon, Lt. Detwiler, Sgt. Rieg, C.O. Stivison, C.O. Hershberger and C.O. Miller.

McIntosh first argues that Captain Lewis, Deputy Superintendent Salamon, Lt. Detwiler and Sgt. Rieg were deliberately indifferent to the use of OC spray during the planned use of force on January 8, 2019 due to his alleged diagnosis with severe asthma. (ECF No. 101 pp. 5-13.)  He also claims he was denied medical treatment for his eye following being sprayed with OC spray three times and that he suffered permanent damage as a result.  (*Id.*)  However, for the reasons discussed above, these claims fail because as the video reflects, no civil rights violations occurred.[13]  Moreover, as reflected in McIntosh's medical records, he sustained no serious harm to his eyes and the results of his eye examination in October, 2021 were that his eyes were normal and there was no change to his prescription.  (ECF No. 108 ¶ 20.)[14]

McIntosh also argues that Superintendent Smith, Captain Lewis, Deputy Superintendent Salamon, Lt. Detwiler, Sgt. Rieg, C.O. Stivison, C.O. Hershberger and C.O. Miller were deliberately indifferent to the conditions of his confinement in cell 1007.  He asserts in his Concise Statement that the cell was cold due to the crack in the window, the plumbing constantly flooded

---

[13] Additionally, there is no evidence that these Defendants had any personal involvement in the deployment of OC spray or that they had knowledge of or acquiesced in any subordinate's actions as it relates to the incidents about which McIntosh complains.  Moreover, there is no evidence that any of these defendants established and maintained a custom, policy or practice which directly caused any constitutional harm.

[14] McIntosh claims that his eyes were not normal because his uncorrected vision was 20/25.  (ECF No. 112 ¶ 20.)  Since the eye exam revealed that there was no change in his prescription, this does not contradict Defendants' evidence that he sustained no permanent damage to his eyes.

the cell, his water was cut off for two weeks, he had no clothing, toilet paper or mattress for two weeks, a light was continuously on for two weeks and he was denied showers, "yard," and cleaning supplies.  (ECF No. 100 ¶¶ 16-23.)  McIntosh also states that he brought these issues to the attention of Defendants Lewis and Salamon within the first two weeks and they told him that he would be moved to another cell after he was "off paper and mattress restriction."  (*Id.* ¶ 29.) Further, he asserts that he also encountered Defendants Smith, Detwiler and Rieg during the time that he was in this cell and told them of his "inhumane cell conditions."  (*Id.* ¶30.)

In their Response to Plaintiff's Concise Statement, Defendants deny that he made a request to move and that his allegations about "comments made by Defendants Lewis and Salamon are not supported by citation to the record."  (ECF No. 105 ¶ 29.) With respect to McIntosh's claim that he told Defendants Smith, Detwiler, Rieg, Stivison, Hershberger and Miller about his cell conditions, Defendants again claim that McIntosh "has not cited to the record in support of his allegations." (*Id.* ¶ 30.) However, because McIntosh's Concise Statement is verified, his statements are sufficient to support these facts and while Defendants deny that these statements are true, they similarly fail to cite to any record evidence. The grievances submitted by McIntosh also reflect alleged conversations with these Defendants that they denied.  Thus, the Court must conclude that whether McIntosh told these Defendants about his complaints, and if so, what he said, are genuine issues of material fact. Thus, it must be determined if there are material issues of fact about McIntosh's conditions of confinement that preclude summary judgment.

The Eighth Amendment's prohibition against cruel and unusual punishment guarantees that prison officials must provide humane conditions of confinement.  Although "[t]he Constitution 'does not mandate comfortable prisons,' . . . neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

Thus, prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "'take reasonable measures to guarantee the safety of the inmates[.]'" *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). To state a claim for an Eighth Amendment violation based on the conditions of confinement, a prisoner must plausibly allege that prison officials' acts or omissions denied him "the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 256 (3d Cir. 2010) (stating that the Eighth Amendment's prohibition of cruel and unusual punishment requires that prison officials provide "humane conditions of confinement").

As a sister court explained:

> [P]laintiffs asserting conditions of confinement claims must demonstrate that they were subjected to an objectively, sufficiently serious deprivation that resulted in the denial of minimal civilized measures of life's necessities and that the defendant prison official was deliberately indifferent to inmate health or safety. *Porter v. Pa. Dept. of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020) (citing *Farmer*, 511 U.S. at 834). A defendant is deliberately indifferent to the conditions of an inmate's confinement if he or she "knows of and disregards an excessive risk to inmate health or safety." *Id.* (quoting *Farmer*, 511 U.S. at 837). An evaluation of the context of the claim is necessary. "Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single identifiable human need such as food, warmth, or exercise—for example a low cell temperature at night combined with a failure to issue blankets." *Id.* at 304.

*Major v. Halligan*, No. 1:21-CV-00068, 2021 WL 6283944, at *10 (W.D. Pa. Nov. 17, 2021).

With respect to issues related to his cell flooding, the exhibit relied upon by McIntosh (ECF No. 101-19) is limited to work orders issued on January 9, 2019 and January 16, 2019 to repair a clogged toilet (ECF No. 101-19 pp. 1-2) and on February 14, 2019 to repair a leaking toilet (ECF No. 101-19 p. 3) in cell 1007 of the RHU. These documents do not support McIntosh's claim that cell 1007 was "constantly flooded." At the same time, however, Defendants fail to refute this claim, noting that McIntosh admits that this issue is disputed. While they state that the work orders

that are in the record (ECF No. 101-1 Ex. N) show that repairs were made to the toilet, they have not submitted evidence to show that no other issues arose.  Thus, whether the cell was constantly flooded, and whether his cell water was cut off for two weeks, as McIntosh claims, remain disputed issues of fact because Defendants have not submitted evidence that conclusively refutes these allegations.

Similarly, the other conditions which McIntosh has raised in support of his claim are disputed.  McIntosh claims that due to a crack in his cell window and the location of his cell, he was constantly cold for the entire two months during which he was confined in cell 1007.  In response, Defendants cite to the response to Grievance No. 795404, which states that staff involved in the incident that gave rise to the Grievance were interviewed and "indicated that they were aware of the crack in the cell window and that they had requested a work order to be submitted to have it fixed….Both staff stated that he had been issued a second blanket [and]…other available staff were interviewed and all denied him ever asking to be moved to a different cell [or] being cold…." (ECF No. 101-11 p. 2.)[15]  However, the fact that a work order was issued does not prove that the window was repaired.  Moreover, McIntosh denies being given a second blanket and states that he requested to be moved to another cell.  This compels the conclusion that there are genuine issues of material fact regarding these conditions.  Similarly, Defendants' mere denial of the other conditions about which McIntosh complains (e.g., lack of clothing for two weeks, no showers, "yard," or cleaning materials) is insufficient to support their request for summary judgement.

Finally, McIntosh must also present evidence that he was harmed by Defendants' conduct. *See, e.g., Roe v. Elyea,* 631 F.3d 843, 863-64 (7th Cir. 2012). While McIntosh complains that he

---

[15] Defendants' citation to the contents of the grievance response, which is not under oath, does not refute McIntosh's claims; rather, it merely creates issues of fact.

sustained swollen feet as a result of the conditions of confinement, the medical records for the relevant time frame do not support a claim that he sustained swollen feet as a result of these conditions.  (*See* ECF No. 109-9 Ex. J, reflecting that McIntosh's feet were not swollen, but he had a scabbed over abrasion on one toe and macerated skin between two other toes on the same foot.)  At the same time, however, there is a difference between proving harm and proving damages, *see Cotts v. Osafo,* 692 F.3d 564, 569 (7th Cir. 2012), and even in the absence of actual damages, McIntosh may be able to demonstrate that he is entitled to nominal or punitive damages in the event that he can prevail on this claim.  42 U.S.C. § 1997e(e).  Therefore, the lack of any physical harm is not necessarily fatal to a claim for nominal or punitive damages in the event that McIntosh is able to prove that his civil rights were violated.

In short, there are genuine issues of material fact that preclude judgment in favor of either McIntosh or Defendants.  The conditions about which McIntosh complains, some of which he claims lasted for the entire two months that he was confined in cell 1007, could represent a violation of his Eighth Amendment rights and he could have sustained harm as a result.  Therefore, both motions for summary judgment will be denied as to this issue.

D.  McIntosh's First Amendment Retaliation Claims against Librarian Weaver, C.O. Rietscha and Superintendent Smith

Both Defendants and McIntosh also move for summary judgment with respect to his First Amendment retaliation claims against Superintendent Smith, Librarian Weaver and C.O. Rietscha.

With respect to Superintendent Smith, McIntosh claims that he should not have been involved in reviewing Grievance Nos. 795404 or 792494. According to McIntosh, Superintendent Smith's review allowed him to facilitate a "cover up" of his own wrongdoings as well as those of his co-workers to prevent McIntosh from pursuing legal action for the events that occurred at SCI

Houtzdale, including the use of OC spray and the conditions of his cell. (ECF No. 101 p. 18; ECF No. 101-11.)

McIntosh's retaliation claim against Librarian Weaver and C.O. Rietscha relates to the mis-delivery of his legal documents, which McIntosh argues was done to stop him from pursuing legal action against a co-worker who threatened to make his life a "living hell." (ECF No. 101 pp. 17-18.)

To state a claim for retaliation, a prisoner must allege that: (1) he was engaged in constitutionally protected conduct; (2) the defendant at issue took an adverse action against him; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take that adverse action. *See, e.g.*, *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). An "adverse action" is one that would "deter a person of ordinary firmness from exercising his First Amendment rights." *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)).

Regarding McIntosh's claim against Superintendent Smith, the evidence reflects that with respect to two grievances, Grievance Nos. 795404 and 792494, Defendant Smith issued a decision as Facility Manager to McIntosh's grievance appeals. (ECF No. 101, Exs. E and I.) Grievance No. 795404, which is dated March 19, 2019, relates to the January 8, 2019 incident as well as the conditions of his cell. As previously discussed, there is no evidence that Superintendent Smith had any knowledge about or involvement in the events of January 8, 2019. While any Smith's knowledge, if any, of the alleged conditions of his cell while McIntosh was confined there is disputed, by the time this grievance was filed, McIntosh was no longer in cell 1007 (*see* ECF No. 101 Ex. I p. 1; ECF Nos. 100, 105 ¶ 16). In his decision, Defendant Smith upheld the response of

the facility grievance coordinator, who rejected the grievance as untimely[16] and also because it related to separate events that required separate grievances.  Superintendent Smith noted that the grievance was "appropriately rejected" for these reasons. (ECF No 101, Ex. E p. 4.)

As it relates to the retaliation claim against Librarian Weaver and C.O. Rietscha, McIntosh filed Grievance No. 898642 regarding a comment allegedly made by C.O. Stivison that he would make McIntosh's life a "living hell."[17]  (ECF No. 101-22; ECF No. 108, 112 ¶ 19.)  He claims that Librarian Weaver and C.O. Rietscha retaliated against him by mis-delivering his mail because of this grievance.  (ECF No. 86 pp. 26-27; ECF No. 100 ¶ 46.)

As Defendants point out, however, the mis-delivery of McIntosh's mail occurred on October 27, 2020.  His grievance was not filed until November 10, 2020 (ECF No. 101 Ex. Q).  Moreover, there is no evidence in the record that either Defendant Weaver or Defendant Rietscha was aware of the comment allegedly made by Stivison or the grievance itself.  Thus, there is no basis for a First Amendment retaliation claim.

For these reasons, McIntosh's motion will be denied and Defendants' motion will be granted as to the retaliation claim against Weaver and Rietscha.

E.  McIntosh's Negligence Claim Against Librarian Weaver and C.O. Rietscha

McIntosh and Defendants both move for summary judgment with respect to his negligence claim against Defendants Weaver and Rietscha.  This claim is based on McIntosh's allegation that on October 27, 2020, after he sent certain legal materials that he needed for his petition for allowance of appeal for copying, copies were initially delivered to the wrong cell. When they were

---

[16] Pursuant to DOC policy, grievances must be submitted within fifteen working days after the events at issue.

[17] The retaliation claim against C.O. Stivison relating to these allegations was previously dismissed. (ECF No. 47.)

finally delivered to him, he claims that there were pages missing or not copied properly, as a result of which his petition for allowance of appeal was denied.  (ECF No. 98 at 13-15.)

To prove a negligence claim, a plaintiff is required to show that: (1) the defendants had a duty to conform to a certain standard of conduct; (2) the defendants breached that duty; (3) such breach caused the injury in question; and (4) the plaintiff incurred actual loss or damage.  *Krentz v. Consol. Rail Corp.,* 910 A.2d 20, 27-28 (Pa. 2006).

Defendants argue that McIntosh's negligence claim is barred by Pennsylvania sovereign immunity. In general, employees of the Commonwealth of Pennsylvania acting within the scope of their duties are immune from liability. 1 PA. CONS. STAT. § 2310; *see, e.g., Moss v. Pennsylvania*, 838 F. App'x 702, 707 (3d Cir. Dec. 9, 2020). To this end, Pennsylvania's sovereign immunity statute affords broad immunity to state officials from state-law tort claims. With respect to claims of negligence, there are certain specifically delineated exceptions to this general rule of sovereign immunity, including, in relevant part, when the claim pertains to the "care, custody or control of personal property in the possession or control of Commonwealth parties[.]" 42 PA. CONS. STAT. § 8522(b)(3).

Here, McIntosh argues that some of his documents were not returned to him after he provided them for copying.  This is a disputed fact since Defendants deny that they failed to do so. Thus, if Defendants were negligent in failing to return his personal property that was in their custody or control, sovereign immunity does not bar this claim.  *See, e.g., Williams v. Stickman*, 917 A.2d 915, 918 (Pa. Commw. 2007), *appeal denied,* 917 A.2d 915 (Pa. 2007).

Nonetheless, McIntosh's negligence claim fails. While it is undisputed that the Librarian Weaver and C.O. Rietscha had a duty to deliver these copies to McIntosh's cell and that they

initially failed to do so, and it remains a material issue of fact as to whether all of his documents were returned, he has failed to show that he sustained any harm as a result.

As reflected on the Supreme Court docket, McIntosh's original Petition for Allowance of Appeal was filed on September 16, 2020, before the events at issue in October 2020. He did not file an Application for Leave to File an Amended Petition for Allowance of Appeal until March 9, 2021, more than four months after he claims some of his documents were lost.  While he claims that these documents were needed to "adequately" file this application (ECF No. 86 p. 18), he was not restricted from filing this application, nor is there any evidence that he made any effort to obtain the documents he claims were missing from some other source in the more than four months after he claimed that documents were missing and integral to his petition. Further, despite his suggestion that both his original Petition and his application to amend his petition were denied on April 6, 2021 due to missing documents, there is no evidence in the record to support his statement. Moreover, while he claims without support to have sustained monetary damages as a result of Defendants' negligence, he was reimbursed for the cost of the copies that were originally delivered to the wrong cell (ECF Nos. 100, 105 ¶ 44, 108, 112 ¶ 18) and has not supported any other claim for monetary relief.

For these reasons, Defendants' motion for summary judgment will be granted and McIntosh's motion will be denied with respect to his negligence claim.

**VI.**     **<u>Conclusion</u>**

For these reasons, McIntosh's Motion for Summary Judgment (ECF No. 98) will be denied and Defendants' Motion for Summary Judgment (ECF No. 106) will be granted in part and denied in part. Appropriate orders will follow.

Dated: March 11, 2024                           BY THE COURT:


                                                /s/Patricia L. Dodge
                                                PATRICIA L. DODGE
                                                United States Magistrate Judge


cc:     Keenan Mcintosh
        Mv-9011
        SCI Phoenix
        P.O. Box 244
        1200 Mokychic Drive
        Collegeville, Pa 19426